Timothy P. **MAHER**, Appellant,

v.

Rosemary McCook **MAHER**, Respondent.

No. 70142.

Missouri Court of Appeals,
Eastern District,
Division Three.

Aug. 5, 1997.

---

**6.** "Spite or ill-will is necessary to satisfy the requisite intent." *J.S. DeWeese,* 881 S.W.2d at 646.

Christophe Karlen, John J. Diehl Jr., St. Louis, for appellant.

Theodore S. Schechter, Michael Schechter, St. Louis, for respondent.

CRAHAN, Chief Judge.

Timothy Maher ("Father") appeals the judgment modifying the parties' decree of dissolution. Father contends the trial court erred in granting Rosemary Maher ("Mother") primary legal and physical custody of their minor son, Andrew, authorizing Mother to move the child to the state of Florida where Mother now resides with her new husband, and awarding Mother $15,000.00 in attorney's fees. Father also asserts that the visitation schedule established by the court is unreasonable and impractical and that the trial court erred in admitting and excluding certain evidence. We affirm the change in custody, the authorization to move the child to Florida and the award of attorney's fees. We find that the visitation schedule is unreasonable and reverse and remand that portion of the judgment with directions to revise the visitation schedule in accordance with the principles set forth in this opinion.

Mother and Father were married in September 1991. Andrew, born January 24, 1994, was the only child born of the marriage. On May 20, 1994, Mother moved out of the marital home. Dissolution proceedings were instituted shortly thereafter. The decree of dissolution, which incorporated the parties' settlement agreement, was entered on July 11, 1994. The decree provided that the parties were to share joint legal and physical custody of Andrew. The decree also prohibited either party from removing Andrew from the state of Missouri for more than 90 days without prior authorization of the court or written consent of the other party.

About a week prior to entry of the decree, Mother began dating James Liermann, who resided in Florida. Mr. Liermann had worked in the computer industry in Florida for several years but his employer eliminated his position in May 1994. Mr. Liermann was then out of work for about six months while he sought new employment. Although he looked for employment in both St. Louis and in Florida, he received only one offer, as vice president of telesales for a company in Tampa, which he accepted. His new position would allow him to earn about $130,000.00 per year in salary and bonuses and this substantial income would enable Mother to stay home with Andrew instead of working as a travel agent as she had originally planned.

In April 1995 after she and Mr. Liermann became engaged, Mother filed a motion to modify the decree. An amended motion was filed in June 1995. The amended motion alleged that there had been a substantial and

continuing change in circumstances including, *inter alia,* Mother's engagement and imminent plans to marry Mr. Liermann, Mother's desire to live in Tampa with Mr. Liermann, advantages to Andrew and Mother which could result from the move and improve the quality of Andrew's life, Mother's status as Andrew's primary caretaker since his birth, the availability of a secure and stable environment for Andrew in Florida, and Father's cohabitance with a woman who was not his wife. Mother sought modification of the decree to grant her primary legal and physical custody of Andrew, permission to change his residence to Florida, an award of temporary physical custody to Father suitable for a non-custodial, non-resident parent and an award of attorney's fees.

Both parties, Mr. Liermann and Father's fiancé, Ms. Sheehan, testified at the hearing and both parties called an expert witness. The trial court later issued extensive findings of fact and conclusions of law as part of its judgment modifying the decree. As noted above, the trial court granted Mother's request for primary legal and physical custody of Andrew, authorized her to move Andrew to her new home in Florida, ordered Father to pay $15,000.00 of Mother's attorney's fees and established a temporary custody and visitation schedule for Father. On appeal, Father presents seven points of error challenging each of these rulings and two related evidentiary rulings.

■■■ Father's first point is directed to that portion of the judgment granting Mother's request for primary physical custody of Andrew and authorizing her to move Andrew to her new home in Florida. In his first subpoint, Father urges that Mother failed to demonstrate a change of circumstances so substantial and continuing as to make the terms of the existing order unreasonable as required by section 452.410 RSMo 1994. Father emphasizes that Mother's original motion was filed just nine months after entry of the decree, that Mother began seeing Mr. Liermann fully knowing that he lived and worked in Florida, and that she became engaged to and married Mr. Liermann despite the fact that her request to move the child to Florida was in litigation and was actively opposed by Father. Father further complains that if the trial court had not prevented him from introducing documents and testimony on the subject, rulings which are the subject of separate points, he would have established that Mother had requested a provision authorizing her to move Andrew out of the state be included in the original decree. Although the significance of these contentions is not entirely clear from the argument following this point, Father's premise appears to be that if Mother was contemplating the possibility of remarriage to Mr. Liermann at the time the original decree was entered and proceeded to marry him knowing that she could not move Andrew without court approval or Father's consent, the trial court could not properly find that Mother's remarriage and her new husband's acceptance of substantial employment in Florida constituted a substantial and continuing change in circumstances. If this is Father's position, it is not supported by any authority and is completely without merit. The fact that a party may have contemplated the possibility of a change in circumstances and prudently, albeit unsuccessfully, attempted to provide for the contingency in the original decree does not mean that there is no substantial and continuing change in circumstances if the contingency ultimately comes to pass. Remarriage and a new spouse's acceptance of employment in another state have been specifically recognized as the sort of substantial and continuing change in circumstances that will support modification if shown to be in the best interest of the child. *Riley v. Riley,* 904 S.W.2d 272, 276 (Mo.App. 1995).

■■■ In another subpoint, Father urges that the weight of the evidence does not support the trial court's determination that, applying the four factor analysis this court has adopted for evaluating a request to move a child permanently to another state, the move to Florida would be in Andrew's best interest. Those factors are:

(1) The prospective advantage of the move in improving the general quality of life for the custodial parent and child;

(2) The integrity of the custodial parent's motives in relocating;

(3) The integrity of the non-custodial parent's motives for opposing relocation and the extent to which it is intended to secure a financial advantage with respect to continuing child support; and

(4) Whether there is a realistic opportunity for visitation which can provide an adequate basis for preserving and fostering the non-custodial parent's relationship with the child if relocation is permitted.

*Id.* at 277; *Wild v. Holmes,* 869 S.W.2d 917, 919 (Mo.App.1994); *Michel v. Michel,* 834 S.W.2d 773, 777 (Mo.App.1992).

■ Citing *Riley,* the trial court found that the move would improve the quality of life for both Mother and Andrew. Mother would be able to enjoy a meaningful and loving relationship with her new husband. Andrew would have the advantage of Mother staying home and caring for him, living in an emotionally stable environment with two mature adults, a positive role model in Mr. Liermann, living in a stable upscale neighborhood with plenty of young families with children, regular church attendance with Mother and Mr. Liermann and proximity to his maternal grandparents if they carry through with their plans to relocate to Florida.

The trial court further found that Mother's motive in moving to Florida is to be with her new husband and not to deprive Father of his visitation rights with Andrew. Although the trial court believed that Father loves his son and wants a healthy father-son relationship, the court concluded that Father's opposition to the move may be motivated by feelings of resentment. The court found that Father believes that Mother and Mr. Liermann had an affair during the marriage and that Mother always planned to move to Florida, although the trial court found neither to be true. Both parties were found to have substantial means to pay the cost of transportation between St. Louis and Florida and to have demonstrated the ability to cooperate with each other on visitation matters.

■ We have carefully reviewed the record and find that these findings are supported by substantial evidence and are not against the weight of the evidence. Although Father directs our attention to other evidence he claims supports contrary findings, such contentions misperceive the nature and scope of our review. In reviewing the sufficiency of the evidence, we view the evidence and reasonable inferences from the evidence in the light most favorable to the judgment and disregard all contrary evidence. *T.B.G. v. C.A.G.,* 772 S.W.2d 653, 654 (Mo. banc 1989). We find no error in the trial court's application of the four factor test set forth in *Riley.*

■ In his other subpoint, Father claims the trial court erred in failing to consider the factors set forth in section 452.375.2 RSMo 1994 in determining what custodial arrangements are in the best interest of the child. In his second full point he makes a similar contention with respect to the determination of legal custody, citing section 452.375.4 RSMo 1994. Although those sections set forth a non-exclusive list of factors to be considered in making an initial determination of custody, modification of an existing decree is governed by section 452.410.1 RSMo 1994 which sets forth the more general standard that the modification serve the best interest of the child. In *Adams v. Adams,* 812 S.W.2d 951, 956 (Mo.App.1991), we noted that a modification of custody may involve a perspective different from the award of initial custody. In the relocation context, the relevant factors for determining the best interest of the child are those set forth in *Riley, supra.* Although Father urges that the joint legal and physical custody arrangements had worked well when Andrew and Mother were residing in St. Louis, the trial court could properly find that the distance involved would necessarily render such arrangements impractical for the foreseeable future. In addition, there was evidence that Father may not have taken his responsibilities as Andrew's joint legal custodian as seriously as he should have. For example, Mother testified that Father was not present on either of the two occasions Andrew had surgery. We find no error in awarding primary legal and physical custody to Mother. Father's first and second points are therefore denied.

Father's third point pertains to the visitation schedule and will be addressed later. In his fourth point, Father claims the trial court erred in admitting Mother's testimony concerning her parents' intentions to move to Florida sometime in the future and in relying on such testimony as one of the bases for the conclusion that the move to Florida would be in Andrew's best interest. When Mother was first asked about her parents' plans, Father's counsel objected that there had been no foundation laid to establish that Mother had any basis, other than hearsay, to know anything about her parents' plans. That objection was sustained. Mother was then asked if she had "participated in discussions and arrangements" with respect to her parents and Mr. Liermann's mother moving to Florida, which Mother answered in the affirmative. When Mother was again asked about those plans, Father's counsel objected that the information Mother had would have to come from the people whose plans Mother was being asked to relate and that her testimony would therefore be hearsay. Mother's counsel rejoined that "she's a part of these discussions. She's a part of the planning. She can testify to it." The trial court overruled the objection. When Mother began to state what her mother was going to do, Father's counsel again objected that Mother was testifying to what her mother told her. Mother's counsel replied that she hadn't said what her mother told her and was instead testifying to what her mother was going to do. The trial court again overruled the objection. Without further objection, Mother then testified that her mother was going to sell her house and move to Florida, her father was looking at a condo in Florida to spend time commuting between St. Louis and Florida and Mr. Liermann's mother would also join them in Florida.

■ On appeal, Father renews his objection that Mother's testimony about her parents' and Mrs. Liermann's plans was necessarily based on hearsay and should have been excluded. The record, however, is at best ambiguous. Mother testified that she had participated in "discussions and arrangements" with respect to the planned moves. Although testimony based on "discussions" would clearly be hearsay, testimony based on

"arrangements" personally performed by Mother in connection with the proposed moves would not be. Unfortunately, neither counsel pinned Mother down as to the basis for her testimony. Thus, on the record presented, we cannot say that Father has met his burden of demonstrating the trial court erred in admitting the testimony. Further, assuming admission of this testimony was error, we are not persuaded that it was so prejudicial as to warrant a new trial. In its findings, the trial court recognized that Andrew would enjoy increased proximity to his maternal grandparents only if they carried through with the plans related by Mother and that possibility does not appear to have been accorded great weight in the trial court's overall assessment of Andrew's best interests. Point denied.

In his fifth point, Father claims the trial court erred in excluding testimony by Mother's former attorney, who was subpoenaed and called to the stand by Father for the purpose of identifying correspondence sent by the former attorney to Father's attorney. According to Father, the documents he sought to have Mother's former attorney identify would have shown that in the dissolution of marriage action just nine months prior to the filing of Mother's motion to modify, Mother had sought to include in the decree a clause allowing her to leave the state with Andrew. The trial court barred the proposed testimony and exhibits on the ground that the information was protected by the attorney-client and/or work product privileges. In his sixth and related point, father complains the trial court erred in excluding wife's testimony on the same subject on the ground that testimony about settlement negotiations is not admissible.

■ We agree with Father that communications between counsel for opposing parties are not protected by either the attorney-client or work product privileges. The attorney-client privilege protects only communications between the attorney and his client, not communications between an attorney and his opponent's counsel. *DeLaporte v. Robey Building Supply, Inc.*, 812 S.W.2d 526, 532 (Mo.App.1991). Work product is

"material prepared in anticipation of litigation or trial." *State ex rel. Missouri Hwy. And Transp. Comm'n v. Anderson,* 759 S.W.2d 102, 104 (Mo.App.1988). This does not encompass settlement proposals to opposing parties.

Mother urges, however, that even if her former counsel's testimony was not privileged, it still was not admissible because the correspondence between counsel constituted evidence of settlement negotiations, citing *McCammon v. McCammon,* 680 S.W.2d 196, 202 (Mo.App.1984). We need not decide this point, however, because we again conclude that Father suffered no prejudice. The only basis proffered by Father for admitting the correspondence between counsel and questioning Mother about her attempt to obtain a clause permitting her to move Andrew to another state was to show that her remarriage and resulting desire to move to Florida with Andrew was not a change in the circumstances existing at the time the decree was entered. As discussed above, this contention is without merit. Accordingly, we deny points five and six.

■ In his seventh point, Father claims the trial court erred in requiring him to pay a portion ($15,000.00) of wife's attorney's fees. An award of attorney's fees is specifically authorized by statute. Section 452.355.1 RSMo 1994. In its judgment modifying the decree, the trial court found that its award of approximately one-half of the fees incurred by Mother was justified by Father's pursuit of his baseless claim that there had been no change in the circumstances of Andrew and Mother since the date of the decree and because a significant portion of Mother's fees were a result of legal maneuvering by Father. There is substantial evidence to support these findings, which have previously been held to be a sufficient basis for an award of fees. *W.E.F. v. C.J.F.,* 793 S.W.2d 446, 460 (Mo.App.1990). Point denied.

We now turn to Father's third point in which Father contends the trial court erred in adopting Mother's proposed findings and conclusions "virtually verbatim" and in adopting, without change, Mother's expert's proposed visitation schedule. Father urges that the proposed visitation schedule is un-

reasonable and impractical and is not in the child's best interests. We have compared Mother's proposed findings with those adopted by the trial court and find that Father's contention that the trial court adopted Mother's proposed findings "virtually verbatim" is not supported by the record. Although many of the findings adopted by the court are those proposed by Mother, others were substantially modified in a manner that, in most instances, was more favorable to Father. The trial court did adopt without change the visitation schedule proposed by Mother's expert, Dr. David B. Clark. Although we do not find that this is erroneous *per se,* we do find that a number of Father's complaints about the visitation schedule are valid and of sufficient importance to necessitate a remand.

A copy of the visitation schedule is attached hereto as Appendix 1. Briefly summarized, the visitation schedule effectively establishes separate visitation schedules for various stages of Andrew's life: up to age 3, age 3–5, age 6–8 and age 8 and beyond. Inasmuch as Andrew is now 3 years old, we need only concern ourselves with the latter three stages. Beginning at age 3, Father was awarded temporary custody of Andrew for one period of 10 consecutive days every 2 months. Although the schedule does not specifically say so, this custody is presumably to occur in St. Louis. In addition, Father is to enjoy temporary custody of Andrew for 12 hours on Father's Day, in Florida if Father's Day does not fall within a longer custodial visit, as well as custody (again apparently in St. Louis) on certain designated holiday weekends and, in alternating years, for 24 hours on Andrew's birthday. At age six, Father's routine custody is changed to every other weekend but Father is required to travel to Florida to exercise it. Father's Day and the alternating holiday/birthday schedule remain the same and Father is awarded an additional 8 weeks of custody during Andrew's summer vacation and 6 days during Andrew's spring break. When Andrew reaches age 8, Father's visitation schedule remains the same but he is no longer required to travel to Florida to exercise his alternate weekend visitation. Thus, the mod-

ified judgment apparently contemplates that, beginning at age 8, Andrew could be required to fly to St. Louis and back every other weekend.

■ Father's first complaint is that the decree does not afford him sufficient time with Andrew. Father points out that, prior to the judgment, he saw Andrew for 6 out of every 14 days and never went more than 6 days without seeing him. Beginning at age 3, however, Father can count on seeing Andrew for only 10 days every 2 months and can see Andrew more frequently only when he is afforded additional custody in accordance with the alternating holiday schedule. Although we are not unsympathetic to Father's desire to spend more time with Andrew, we can find nothing in Father's brief or in the record before us that suggests that more or more frequent visitation is feasible. Father did not file a proposed visitation schedule, electing instead to pursue an all-or-nothing strategy of attempting to persuade the trial court that Mother should not be permitted to move Andrew to Florida. It is simply unrealistic to expect that visitation between a parent and child separated by more than 1000 miles can be of the same frequency or duration as may have been feasible when they were located in the same city. This unfortunate fact is simply one of the factors that must be weighed in the overall determination of whether a proposed move is in the child's best interests. The bare fact that the visitation schedule ordered by the court does not afford Father the same amount or frequency of visitation he enjoyed when Andrew was living with Mother in St. Louis is not, by itself, a basis for reversal.

■ Father's next complaint is that the visitation schedule unrealistically requires him to travel to Florida in order to exercise visitation that is limited to as little as 9 or 12 hours with Andrew. Although the majority of these partial-day periods of visitation in Florida were to occur before Andrew reached age 3 and are therefore moot, the remainder of the schedule does limit Father to a mere 12 hours with Andrew in Florida on Father's Day and 24 hours with Andrew on his birthday every other year in St. Louis, which visitation apparently includes at least a portion of Andrew's travel time. Father also complains of the burden imposed by requiring him to travel to Florida every other weekend to exercise visitation when Andrew is ages 6–8, a burden Father points out is inexplicably shifted to Andrew at age 8 and beyond. We agree that these features of the visitation plan require modification.

In *Riley*, we specifically addressed the tremendous burden travel imposes on parent and child attempting to spend quality time together when they reside in distant locations. We observed that the wear and tear of extensive travel diminishes the quality of the time spent together and may well engender deep feelings of resentment on the part of the child, the parent or both. 904 S.W.2d at 279. In reversing the visitation schedule ordered by the trial court, we remanded with specific directions to devise a schedule containing no visitation periods of less than two days and no visitation requiring travel by the child shorter than three days. *Id. Riley* involved development of a visitation schedule for two teenage boys, who were 15 and 18 years old at the time of our remand. If such limitations on out-of-state visitation are appropriate for children in their teens, it is surely error to adopt a visitation schedule that violates those same limitations for a child of tender years.

Mere compliance with the guidelines in *Riley*, however, is not sufficient to protect the interests of a pre-teenage child. Even if the 12 hour Father's Day and 24 hour birthday visits were eliminated entirely, the visitation schedule proposed by Dr. Clark and adopted by the trial court could potentially require Andrew to travel by plane to St. Louis up to 10 times per year each year until he is 6 years old. This is simply an excessive amount of travel for a child of that age. From age 6–8, the visitation schedule requires Father to travel to Florida 26 times per year. After age 8, that same travel schedule could potentially be imposed on Andrew. In *Riley*, we observed that the overall quality of visitation may be adversely affected by imposing excessive travel requirements on either the parent or the child. *Id.* Requiring either Andrew or Father to make 26 plane trips per year is clearly excessive.

■ Many of the problems posed by the visitation schedule are attributable to Dr. Clark's attempt to divide all of the holidays and other significant days "even-Steven" among Mother and Father in alternating years. We recognize that certain holidays and special days such as birthdays can be highly significant to a child and that parents have an understandable desire to be with the child on the actual day of the event. When both parents and the child reside in the same city, it is often feasible and appropriate to divide these days between the parents on an alternating basis as was done here. Unfortunately, holidays also happen to be the most logical dates to use for visitation involving travel because that is when the child or parent is free to travel and still have a sufficient amount of time remaining for a meaningful visit. In addition, holidays tend to be dispersed throughout the year, allowing for more frequent visitation, an important consideration in maintaining the bond with the non-custodial parent. In devising a realistic visitation for a parent and child located in distant cities, factors such as minimizing travel by both the parent and child, assuring that the length of scheduled visits is sufficient to permit meaningful time together and maintaining sufficient frequency of visitation to maintain the parental bond clearly take precedence over desirable but subordinate concerns such as equal division of holidays and other significant days.

Another major problem with Dr. Clark's approach is the placement of excessive limitations on Father's visitation in Florida. As a practical matter, all that should ordinarily be required is sufficient advance notice to the custodial parent to avoid disrupting planned events involving the child. The non-custodial parent's employment obligations will ordinarily prevent them from spending an inordinate amount of time in a distant city. If necessary, the decree could authorize some maximum number of days of visitation in the child's city, to be exercised as the non-custodial parent's schedule permits. Designating specific days for visitation in the child's city of residence virtually assures that there will be times that the non-custodial parent will be unable to exercise scheduled visitation. Even the most understanding employer cannot always assure its employees that they will be able to take time off from work whenever they want it. An employer may also sometimes find it necessary to require its employees to work overtime or on weekends. If this occurs at a time when visitation is scheduled in the child's city, the child may interpret the failure to exercise visitation on the scheduled date as a sign of loss of affection. The custodial parent may also attempt to use a non-custodial parent's failure to exercise all scheduled visitation as a weapon in future custody disputes. These problems can be ameliorated if not eliminated by allowing the non-custodial parent to exercise visitation in the child's city whenever his schedule permits, limited solely by a requirement of specified notice.

For the foregoing reasons, we hold that the visitation schedule set forth in the judgment is an abuse of discretion and that this portion of the judgment must be reversed and remanded. On remand, the parties shall be given a reasonable opportunity to agree upon a reasonable visitation schedule. If they cannot agree, the parties shall be given an opportunity to present additional evidence and the trial court shall adopt a new schedule consistent with the principles set forth in this opinion. In all other respects, the judgment is affirmed.[1]

GRIMM and HOFF, JJ., concur.

### APPENDIX 1

### TEMPORARY CUSTODY SCHEDULE FOR FATHER

Present to Age 3

ROUTINE CUSTODY

With Father one period of 7 consecutive days during each 2–month period.

SPECIAL DAYS

With Father on Father's Day each year, from 9:00 a.m. until 6:00 p.m. Father

---

**1.** Mother's motions to dismiss the appeal or, in the alternative, to strike Father's brief are denied.

must travel to Child if this day does not fall within a longer custodial visit.

VACATION

None

HOLIDAYS

With Father for Holiday Group A in odd-numbered years and Holiday Group B in even-numbered years. Father must travel to Child if this day does not fall within a longer custodial visit.

Holiday Group A
| | | |
|---|---|---|
| 1. | President's Day | 9:00 a.m.—9:00 p.m. |
| 2. | July 4 | 9:00 a.m.—9:00 p.m. |
| 3. | Columbus Day | 9:00 a.m.—9:00 p.m. |
| 4. | Christmas Day | 9:00 a.m.—9:00 p.m. |
| 5. | Child's Birthday | 9:00 a.m.—9:00 p.m. |

Holiday Group B
| | | |
|---|---|---|
| 1. | Martin Luther King Day | 9:00 a.m.—9:00 p.m. |
| 2. | Memorial Day | 9:00 a.m.—9:00 p.m. |
| 3. | Labor Day | 9:00 a.m.—9:00 p.m. |
| 4. | Thanksgiving Day | 9:00 a.m.—9:00 p.m. |
| 5. | Christmas Eve (December 24) | 9:00 a.m.—9:00 p.m. |

### Age 3–5

ROUTINE CUSTODY

With Father one period of 10 consecutive days during each 2–month period.

SPECIAL DAYS

With Father on Father's Day each year from 9:00 a.m. until 9:00 p.m. Father must travel to Child if this day does not fall within a longer custodial visit.

VACATION

None

HOLIDAYS

With Father for Holiday Group A in odd-numbered years and Holiday Group B in even-numbered years.

*Holiday Group A*

1. PRESIDENT'S DAY/WASHINGTON'S BIRTHDAY (OBSERVED) weekend from 5:00 p.m. the Friday prior through 8:00 a.m. the Tuesday following.

2. INDEPENDENCE DAY (July 4th) holiday from 5:00 p.m. the next non-weekend day before to 9:00 a.m. the weekday next following.

3. COLUMBUS DAY weekend from 5:00 p.m. the Friday prior through 8:00 a.m. the Tuesday following.

4. CHRISTMAS vacation from December 25th beginning at 10:00 a.m. through 9:00 a.m. on December 31st.

5. The child's birthday from 9:00 a.m. until 9:00 a.m. the following day.

*Holiday Group B*

1. MARTIN LUTHER KING DAY weekend from 5:00 p.m. the Friday prior through 8:00 a.m. the Tuesday following.

2. MEMORIAL DAY weekend from 5:00 p.m. the Friday prior through 8:00 a.m. the Tuesday following.

3. LABOR DAY weekend from 5:00 p.m. the Friday prior through 8:00 a.m. the Tuesday following.

4. THANKSGIVING weekend from 5:00 p.m. the Wednesday prior through 8:00 a.m. the following Monday.

5. CHRISTMAS vacation from 5:00 p.m. the day the child's school Christmas vacation begins through 10:00 a.m. on December 25th and December 31st beginning at 9:00 a.m. through 8:00 a.m. the day the child's school Christmas vacation ends.

### Age 6 and Beyond

ROUTINE CUSTODY

With Father two weekends per month, from Friday after school to beginning of school the following Monday morning. Father must travel to Child for these visits from child's Age 6 to Age 8.

SPECIAL DAYS

With Father on Father's Day each year, from 9:00 a.m. until 9:00 p.m. Father must travel to Child if this day does not fall within a longer custodial visit.

VACATION

1. With Father eight weeks in summer (in 4–week segments unless mutually agreed otherwise).

2. With Father 6 days during the Child's school Spring Break, the exact days to be selected and written notice given to Mother not later than 30 days prior to the start thereof.

HOLIDAYS

With Father for Holiday Group A in odd-numbered years and for Holiday Group B in even-numbered years.

*Holiday Group A*

1. PRESIDENT'S DAY/WASHINGTON'S BIRTHDAY (OBSERVED) weekend from

5:00 p.m. the Friday prior through 8:00 a.m. the Tuesday following.

2. INDEPENDENCE DAY (July 4th) holiday from 5:00 p.m. the next non-weekend day before to 9:00 a.m. the weekday next following.

3. COLUMBUS DAY weekend from 5:00 p.m. the Friday prior through 9:00 a.m. the Tuesday following.

4. CHRISTMAS vacation from December 25th beginning at 10:00 a.m. through 9:00 a.m. on December 31st.

5. The Child's birthday from 9:00 a.m. until 9:00 a.m. the following day.

*Holiday Group B*

1. MARTIN LUTHER KING DAY weekend from 5:00 p.m. the Friday prior through 8:00 a.m. the Tuesday following.

2. MEMORIAL DAY weekend from 5:00 p.m. the Friday prior through 8:00 a.m. the Tuesday following.

3. LABOR DAY weekend from 5:00 p.m. the Friday prior through 8:00 a.m. the Tuesday following.

4. THANKSGIVING weekend from 5:00 p.m. the Wednesday prior through 8:00 a.m. the following Monday.

5. CHRISTMAS vacation from 5:00 p.m. the day the Child's school Christmas vacation begins through 10:00 a.m. on December 25th and December 31st beginning at 9:00 a.m. through 8:00 a.m. the day the Child's school Christmas vacation ends.