**In re the Matter of C.H., by her Next Friend, C.H., and C.H., Individually, Petitioners/Respondents,**

**v.**

**C.W., Respondent/Appellant.**

**No. ED 98749.**

Missouri Court of Appeals, Eastern District, Division Two.

Sept. 3, 2013.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 10, 2013.

Application for Transfer Denied Nov. 26, 2013.

Jonathan D. Marks, St. Louis, MO, for Petitioners/Respondents.

Carla R. Allen, St. Louis, MO, for Juvenile.

Julie D. Hixson–Lambson, Joseph A. Lambson, Clayton, MO, for Respondent/Appellant.

SHERRI B. SULLIVAN, J.

*Introduction*

C.W. (Mother) appeals from the trial court's Findings, Conclusions, Order and Judgment (Judgment) of paternity, custody and support entered March 24, 2012, as amended by its Order and Judgment entered July 19, 2012. We affirm in part and remand in part.

*Procedural Background*

On February 7, 2011, three weeks before Child's third birthday, C.H. (Father) filed a Petition seeking a judgment declaring him Child's natural father and granting him joint legal custody and joint physical custody thereof. On March 31, 2011, Mother filed an Answer conceding paternity and asking for sole legal and physical custody of Child and $755 per month in child support. On November 28, 2011, the trial court held a hearing on the Petition and Answer. Evidence was adduced at the hearing as later set out in this opinion.

On March 24, 2012, the trial court issued its Judgment, finding Father is the natural father of Child and ordering the parties to share joint legal custody and joint physical custody, with Father designated the residential parent for mailing and educational purposes.[1] The Judgment ordered Father to pay Mother $373 per month for child support until Child begins kindergarten as of August 1, 2013, after which the support obligation terminates, and awarded Father the sole right to claim Child as a dependent exemption on his federal and state tax returns beginning with tax year 2012.

---

1. Specifically, the judgment provides starting March 31, 2012, the parties will alternate periods of two consecutive months of physical custody until Child begins kindergarten in August 2013; as of August 1, 2013, Child will principally reside with Father, with Mother receiving physical custody on President's Day weekend, Martin Luther King Day weekend, Memorial Day weekend, and Labor Day weekend; spring break, Thanksgiving, alternating Christmas vacations, and six weeks of the summer.

On April 23, 2012, Mother filed a post-trial Motion for Change of Judge and a Motion to Amend, Correct or Set Aside the Judgment. On July 5, 2012, the trial court heard the two motions, denying the former and granting in part the latter, entering an Order and Judgment on July 19, 2012, correcting some typographical errors in the original Judgment and clarifying Mother's right to designate an additional person to transport Child for custodial exchanges. This appeal follows.

### Factual Background

In 2002 or 2003, Mother and Father met at Henderson State University in Arkansas, where both were undergraduates. In June 2006, after they graduated, Father and Mother moved to St. Louis and remained a couple, but did not live together. Father is a native of St. Louis and his parents reside in St. Louis. Mother's parents reside in Arkansas. Mother became pregnant with Child in June 2007 and moved into Father's parents' home for one month, according to Mother, and according to Father, until February 1, 2008; thereafter she and Father moved into an apartment one or two months before Child's birth on February 28, 2008. They lived together caring for Child from February to October 2008, when Mother asked Father to move out of the apartment because she discovered he had a relationship with another woman. Mother did not work while they lived together and considered herself the primary caregiver of Child during this time, while she acknowledged that Father participated in caring for Child. Father worked and still works full-time at AT & T grossing approximately $70,000 a year.

After Father moved in October 2008, he continued paying Mother's and Child's rent at the apartment until March 2010, when a support order was entered; see *infra.* The parties remained a couple for a while and attended counseling. During this time period Father would come to the apartment every day to spend time with Child, but he would not stay overnight.

In August 2009, the parties separated. Mother began working part-time as a hairstylist at Beauty Brands Salon and as a teacher in the Hazelwood School District,[2] and she enrolled Child in daycare at Shalom Child Development Center (Shalom). Father paid for Child's daycare,[3] Mother's rent at the apartment and Child's health insurance. Father and Mother worked out a custody schedule whereby Father had custody of Child on Tuesday and Wednesday evenings at the apartment while Mother went to church; picked up Child from daycare and brought her to the apartment on Thursday and Fridays, and had custody on alternate Saturdays and Sundays while Mother worked at the beauty shop. In September 2009, the parties modified the schedule to include overnight visitation on Tuesdays, Thursdays, and some Saturdays.

On March 8, 2010, Mother obtained an administrative order she had sought without Father's participation or knowledge from the Family Support Division under which Father was determined to be the parent of Child and ordered to pay Mother $755 per month for child support beginning March 15, 2010. Father has remained current on his support obligation.

---

2. Mother has a cosmetology license as well as a bachelor's degree in general studies and a master's degree in education with an emphasis in physical education, which she earned in May of 2010.

3. Mother received state childcare assistance reducing the cost of Shalom from $125 per week to $68.50 per week, which Father agreed to pay.

In April 2010, Father was promoted at AT & T. His work hours changed from 11:00 a.m. to 8 p.m. to 8 a.m. to 5 p.m., so he could exercise overnight custody on Wednesdays, Thursdays, and some Fridays, and alternate weekends from Saturday until Sunday night. Child attended daycare at Shalom for approximately six months, and switched to Higher Ground daycare in August 2010.

In August 2010, Mother informed Father of her decision to move to Plano, Texas, indicating her reason was that she wanted a "fresh start." Father claims when he asked her what she meant by "fresh start," she cited a job opportunity, a better life, being closer to her extended family and close friends, and doing what's best for her and Child. Also, Mother's parents in Arkansas were several hours' drive closer to Plano, Texas than to St. Louis. Prior to leaving St. Louis, Mother worked as a hair stylist/beautician for Beauty Brands; after moving to Plano, she transferred her job and remained with Beauty Brands as a hairstylist/beautician. Mother receives just slightly more compensation at the Plano Beauty Brands than she did at the St. Louis Beauty Brands, working approximately 30 hours per week and grossing about $1,100 per month. Mother has not sought employment in Plano as a teacher.

The trial court found the parties dispute whether Father objected to Mother moving Child to Plano, Texas. While Mother claims Father never objected to her moving to Texas with Child, Father maintains he objected to her decision, and did so in writing via email on January 26, 2011. Mother states she offered via email dated August 18, 2010 to give Father the first option to keep Child for a month while she got settled in Plano in October 2010, when she was scheduled to start her new job at the Plano beauty shop, but he failed to respond to this email. Father testified he offered to keep Child rather than have Child stay in Arkansas with Mother's parents while Mother established herself in Plano but Mother declined. Mother admitted Father did send her an email asking to keep Child rather than have her stay in Arkansas, but Mother preferred the Arkansas arrangement because then she could go every weekend to Arkansas to see Child.

In October 2010, Mother left St. Louis with Child, leaving her in the care of Mother's mother in Arkansas while Mother settled in Plano, Texas. Child began living with Mother in Plano in November 2010. Mother and Child live in a one-bedroom apartment. Mother enrolled Child in daycare/preschool at SandCastle Private School in February 2011. Mother receives state-subsidized childcare for SandCastle, and if Child misses more than 30 days in a school year, Mother will lose her childcare subsidy. The subsidy allows Mother to pay only $150 for what would normally cost $801.66 per month. The trial court found Mother has cited the possibility of her losing the subsidy as reason on several occasions for denying Father's requests to have extended visits with Child. Mother testified that because of Child's progress she is eligible to move up a year into the pre-kindergarten class. Mother planned to enroll Child in kindergarten early at age four in 2012, instead of the usual age five. The trial court found Mother made this decision without consulting Father, and this decision will detrimentally affect Father's time with Child.

The trial court found that since Child moved with Mother to Plano, Father saw Child in January 2011 for a month in St. Louis; in February 2011 in Arkansas to celebrate Child's third birthday; a weekend in May 2011 in St. Louis; two visits to Texas in May 2011 and August 2011, for a

collective week; from June 7 to June 11, 2011 when Mother and Child came to St. Louis for a court date; September 2011 Labor Day weekend in St. Louis; and in November 2011 for a few days prior to Thanksgiving when Father flew to Texas to retrieve Child, bring her to St. Louis, then return with her to Plano.

On September 28, 2011, Father sent Mother an email requesting to see Child for an extended period but Mother said that if Father wanted to see Child more, he would have to come to Plano; Child could not miss daycare. Father offered to have Child enrolled in daycare/preschool in St. Louis, but Mother refused. The trial court also found that Mother denied Father access to Child's records at SandCastle or to speak to Child's care providers about her progress despite Father's repeated requests over a period of about two months starting in July 2011. Mother eventually told SandCastle they were permitted to talk to Father about Child and supply him with records of Child's progress. Mother canceled a visit after Labor Day weekend because, according to her testimony, Father had just seen Child and it would be a waste of days that Child is allotted to miss per the subsidy to visit again so soon.

### Points on Appeal

In her first point, Mother claims the trial court erred in applying a relocation analysis to an initial custody determination and using Mother's relocation to Texas as the primary basis for denying her residential parent status.

In her second point, Mother contends the trial court's decision in awarding Father residential custody of Child was against the weight of the evidence and failed to consider Child's adjustment to her home in Texas and relationship with Mother who had always been her primary caregiver.

In her third point, Mother asserts the trial court abused its discretion in denying Mother's post-trial motion for change of judge based on the court's improper personalization of the case and consideration of race and other cases in its decision.

In her fourth point, Mother argues the trial court erred in awarding Father the 2012 federal tax dependency exemption because pursuant to 26 U.S.C. Section 152(e), as well as Missouri child support guidelines, Mother, as the custodial parent, was entitled to receive the dependency exemption.

In her fifth point, Mother maintains the trial court abused its discretion and erroneously applied the law in rejecting the parties' proposed parenting plans and entering its own parenting plan.

### Standard of Review

■ The trial court's judgment will be upheld unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo.banc 1976); *A.E.B. v. T.B.*, 354 S.W.3d 167, 170 (Mo.banc 2011).

■ In child custody matters, we give greater deference to the trial court's decision than in other cases. *Thorp v. Thorp*, 390 S.W.3d 871, 877 (Mo.App. E.D.2013). The trial court determines what is in the best interest of the child and this Court determines whether there is evidence to support that assessment. *Lavalle v. Lavalle*, 11 S.W.3d 640, 646 (Mo.App. E.D. 1999). When an appellant challenges a decision as against the weight of the evidence, as in Mother's appeal, we view the evidence and reasonable inferences from the evidence in the light most favorable to

the judgment and disregard all contrary evidence. *Id.* Where there is conflicting evidence, we defer to the trial court and will affirm the trial court's judgment even if there is evidence that would support a different conclusion. *Abernathy v. Meier*, 45 S.W.3d 917, 922 (Mo.App. E.D.2001).

■ We will affirm a denial of a motion for recusal unless the court abused its discretion. *Lapee v. Snyder*, 198 S.W.3d 172, 176 (Mo.App. W.D.2006).

## Discussion

### Points I and II—Custody Determination

In this initial determination of Child's custody, Mother claims the trial court impermissibly applied a "relocation analysis" in denying her residential parent status of Child.

■ In the proceedings *sub judice*, the trial court was faced with the task of making an initial custody determination and not a modification. A different standard is applied when making an initial custody determination than when determining whether to modify custody. *DeFreece v. DeFreece*, 69 S.W.3d 109, 113 (Mo.App. W.D.2002). The initial determination of custody is made based on consideration of the eight factors set out in Section 452.375,[4] not based on who happens to have actual custody of the child from the time of separation until the judge makes the custody determination. *Id.* Section 452.375 governs the initial award of custody in paternity cases as well as dissolution cases. *A.E.B. v. T.B.*, 354 S.W.3d 167, 170 (Mo.banc 2011); *Day ex rel. Finnern v. Day*, 256 S.W.3d 600, 602–3 (Mo.App. E.D. 2008). Section 452.375 requires a court to determine custody in accordance with the best interests of the child after consideration of the relevant factors. *Day*, 256

S.W.3d at 602–3; *DeFreece*, 69 S.W.3d at 113. The initial determination of custody is based on the best interests of the child and consideration of the eight factors set out in Section 452.375.2, which provide:

(1) The wishes of the child's parents as to custody and the proposed parenting plan submitted by both parties;

(2) The needs of the child for a frequent, continuing and meaningful relationship with both parents and the ability and willingness of parents to actively perform their functions as mother and father for the needs of the child;

(3) The interaction and interrelationship of the child with parents, siblings, and any other person who may significantly affect the child's best interests;

(4) Which parent is more likely to allow the child frequent, continuing and meaningful contact with the other parent;

(5) The child's adjustment to the child's home, school, and community;

(6) The mental and physical health of all individuals involved . . . [;]

(7) The intention of either parent to relocate the principal residence of the child; and

(8) The wishes of a child as to the child's custodian. . . .

*Day*, 256 S.W.3d at 603; *DeFreece*, 69 S.W.3d at 113; *A.E.B.*, 354 S.W.3d at 170–71. Section 452.375.2(7) authorizes a trial court making an initial custody determination to consider "[t]he intention of either parent to relocate the principal residence of the child," but this allowance for consideration of a party's choice to relocate in the future does not provide statutory authority to compel a party to relocate from his or her desired and existing residence as part of the custody judgment. *A.E.B.*, 354 S.W.3d at 171.

4. All statutory references are to RSMo 2006, unless otherwise indicated.

■ Section 452.377, the relocation statute, provides for modification of *existing* custody or visitation arrangements. *Brown v. Shannahan,* 141 S.W.3d 77, 79 (Mo.App. E.D.2004). The relocation procedures of Section 452.377 are inapplicable in cases where there has not yet been an initial determination of custody. *A.E.B.,* 354 S.W.3d at 170. Section 452.377 requires the court to determine that the relocation: (1) is in the best interests of the child, (2) is made in good faith, and (3) if ordered, complies with the requirements of subsection 10. Subsection 10 requires the court to make findings and to order specific arrangements regarding the travel costs associated with the visitation rights of the non-custodial parent. Section 452.377.10. See also *Stowe v. Spence,* 41 S.W.3d 468, 469 (Mo.banc 2001). Subsection 9 also provides that "[t]he party seeking to relocate shall have the burden of proving that the proposed relocation is made in good faith and is in the best interest of the child." Section 452.377.9. See also *Abernathy,* 45 S.W.3d at 923.

■ In the instant case, the trial court did not apply a relocation analysis, nor did it preclude Mother from relocating. It also did not, as Mother contends, "punish" her for relocating prior to the initial custody determination. When the trial court considered Mother's actions it did so with regard to whether they were taken with Child's best interests in mind and whether they resulted in Child's best interests. In ascertaining the best interests of a child, a trial court may consider the conduct of the parties. *In re Marriage of Campbell,* 868 S.W.2d 148, 153 (Mo.App. S.D.1993). This consideration is allowed when Mother's actions have what the court considers to be a detrimental impact on Child's best interests; are in contravention of Child's best interests; and interfere with Child's frequent, continuing and

meaningful contact with Father without any compelling reasons in terms of benefits to Child. The public policy of Missouri is to assure children frequent and meaningful contact with both parents after the parents have separated, Section 452.375.4, and Section 452.375.2(8) directs that regard be given to which parent is more likely to allow the child frequent and meaningful contact with the other parent. The child's best interests are paramount in determining custody. *Chapman v. Chapman,* 871 S.W.2d 123, 125 (Mo.App. E.D. 1994).

■ The trial court examined the parties' choices, conduct, circumstances, testimony and other evidence in determining the best interests of Child with regard to residential custody. Mother cannot ask that her relocation with Child to Texas be ignored in determining Child's best interests, and cannot be considered in a vacuum. The trial court, although it did clearly find and so stated that it considered Mother's move to Texas to be without any benefits to her or Child, focused more on Mother's actions while in Texas in preventing Father's reasonable contact with Child. The trial court applied the proper Section 452.375 best interests analysis in determining who should have residential custody of Child.

■ The trial court's Judgment in this case evidences the proper application of Section 452.375, not Section 452.377. The record indicates and the Judgment reflects that Child is too young to display a preference for either parent; neither parent indicates an intent to relocate; none of the parties has any documented physical or mental conditions affecting the custodial decision; and Child appears to be a well-adjusted, intelligent and thriving child in both custodial environments, which have suitable care and educational facilities, community, activities and family. The tri-

al court found Father has a two-bedroom apartment where Child would have her own room, furniture and television. Father would enroll Child in the Pattonville school district, starting Child in kindergarten at age five. In Plano, Child lives in a temporary one-bedroom apartment with Mother. Both parents desire physical custody of Child and have maintained a close, loving, supportive, interested relationship with Child. Father has significant close family and friends in St. Louis, including his parents. Mother has close friends and extended family in Texas as well. Mother's parents are in Arkansas, which is several hours' drive closer to Plano, Texas than to St. Louis.

With regard to the interrelationship between the parents and which parent is more likely to allow Child frequent, continuing and meaningful contact with the other parent, based on the respective parties' past performance, testimony, and proposed parenting plans, the trial court found that Father is more likely to allow Child frequent, continuing and meaningful contact with Mother. As the trial court put it succinctly after hearing Mother's post-trial motions: "[T]his order was driven by [Mother]'s unwillingness to allow Dad to have, in my perspective, a reasonable relationship with his child, that's it."

The evidence in support of the trial court's decision includes, but is not limited to, the following. On September 28, 2011, when Father requested to see Child, Mother said that if Father wanted to see Child more, he would have to come to Plano; Child could not miss daycare/preschool lest Mother lose the subsidy. Father offered to have Child enrolled in daycare/preschool in St. Louis, but Mother refused. Mother denied Father access to Child's records at SandCastle or to speak to Child's care providers about her progress despite Father's requesting four times

until Mother eventually relented. Mother canceled a visit after Labor Day weekend because she felt Father had seen Child sufficiently recently and another visit would be a waste of subsidized childcare days. Mother characterized Father's attempts to communicate with her as to why he could not see Child more as "harassment," refused to speak with him on the phone and directed him to speak to her lawyer. Mother testified she considers Child's education, as a three-year-old, to be more important than time spent with Father. In her proposed parenting plan, Mother requested sole legal and physical custody of Child.

Father spent considerable money on plane tickets to fly to Texas and retrieve Child for visits. Father extended business trips to Dallas at his own expense in terms of hotel, plane fare, meals and mileage to spend time with Child in Texas. Father sought a job transfer through AT & T to Texas but was denied; he was willing to move to Texas to be with Child. Father has not blocked communications with Mother. Father took time off work when Mother and Child were in town to spend time with Child. Father will pay the $500 per month for kindergarten at Pattonville, which at age five Child will begin in August 2013. Father already carries health insurance for Child and will continue to do so. Father is prepared to pick up Child every day from school, and if for some reason he is not able, Father's mother is able and ready to do so. Father has Child's own bedroom ready and waiting for her. Father has never been delinquent or remiss on his child support. In his proposed parenting plan, Father is willing to share custody with Mother.

With regard to its decision that the parties would have joint legal and physical custody, the trial court made 77 specific findings of fact. With regard to its desig-

nation of Father as the residential parent, the trial court gave the following reasons for its decision:

(a) The move from St. Louis to Plano had no professional advantages for Mother; ...

(b) Any improvement in the general quality of life of Mother and the minor child with the move from St. Louis to Plano is speculative; ...

(c) Since her move to Plano, Mother has consciously chosen to minimize Father's visitation with the minor child; ....

(d) Mother believes she has the unfettered right to determine what serves the best interests of the minor child; ...

(e) Father is more likely than Mother to foster the relationship of the minor child with the other parent;....

In its findings, the trial court in particular noted under (c) and (e) that despite Father's continued payment since October 2010 of the amount required under the administrative order for support of Child, "Mother has refused Father extended visitation with the minor child in St. Louis solely because of Texas' absence policy for recipients of state subsidized care, which Mother had been receiving while in St. Louis," and "Mother has allowed her dependence on continued receipt of state subsidized childcare to dictate the length, locale and frequency of Husband's visitation with the minor child." The trial court also took note of the fact that Mother's unilateral decision to enroll Child early in kindergarten at age 4 in 2012 in Plano, Texas "will severely and unnecessarily curtail Father's physical custody of the minor child." Finally, the court cited Mother for placing "her own selfish interests ahead of the best interests of the minor child; therefore, Mother's judgment is questionable and requires that Father be an equal

participant with Mother in all decisions affecting the health, education and welfare of the minor child."

Based on the foregoing, the trial court's decision to award Mother and Father joint physical and legal custody of Child, with Father's home designated Child's residential address, is not against the weight of the evidence and the trial court did not erroneously apply a "relocation analysis" to the custody issue. Points I and II are therefore denied.

*Point III—Recusal*

■■■ Mother claims the trial judge should have recused himself upon Mother's motion for change of judge because he made comments suggesting he (1) considered race in his custody decision; (2) personalized the case by comparing Child to his granddaughter; and (3) based his decision upon his experience in other cases. A disqualifying bias and prejudice is one with an extrajudicial source that results in the judge forming an opinion on the merits based on something other than what the judge has learned from participation in the case. *State v. Cella*, 32 S.W.3d 114, 119 (Mo.banc 2000).

A photo of Child with her classmates in preschool was entered into evidence by Mother to demonstrate her environment in Plano, Texas. Upon receiving it, the trial judge counted the number of African–Americans [5] in the photo and commented:

Court: Doesn't look very racially diverse; is that a fair statement? She would be—no, she's not the only [African–American] but pretty close.

[Mother's counsel]: Check out the cheerleading squad, also a couple of African Americans.

Court: I was looking at the Easter Egg [picture].

5. Mother, Father and Child are African–American.

The trial judge made the following additional comments to the parties upon taking the case under submission:

> Court: You know, you two are two really educated people. I commend you both for doing that. I've been doing this gig 20 years on this side of the bench, I did it out there for 20.
>
> Obviously I didn't grow up black. I didn't grow up black in the City of St. Louis, obviously, but I've watched it and I know how damn hard it is. I suspect Plano, Texas or Dallas isn't any easier.
>
> . . .
>
> But yeah, there is less prejudice in this world but not enough less prejudice. I would hope that the school becomes more diverse in Texas. It's not very diverse from the pictures I saw. It may be more diverse, you weren't taking pictures to show me the diversity of this. Hopefully if it's not diverse that the kids in that school will recognize that it really doesn't matter what color your skin is.
>
> And to the extent that she comes up here, sir, I'm sure you want the best education you could find for her and hopefully if that's the case you'll find a place that recognizes that whether you're black, white, pink, or yellow doesn't really matter. But it does matter, sadly, in the eyes of too many people.
>
> And you guys are going to have to work real hard to make sure that that is not something she experiences and she is the person you two want her to be. There is a black president, damn, that's impressive. I never thought it would happen in my lifetime but it did. Hopefully that's the first step in moving forward. But there is still too much going on you two need to work very hard to make sure she doesn't suffer from it. It's going to be hard for you two no matter where you're going to raise her

with the distance between the two of you.

Mother contends the preceding dialogue can reasonably be seen to reflect the trial judge's apparent concern, based upon the photo, that Child's preschool in Plano, Texas was not very racially diverse and due to this lack of diversity was more concerned about racial prejudice if custody was placed with Mother.

Mother filed a post-trial motion for change of judge based upon her contention that the judge based his decision on the lack of racial diversity in the Plano, Texas preschool that Child attended. The trial court held a hearing on the motion for disqualification, then denied the motion, declaring that race or diversity had no consideration in his decision. The trial judge stated explicitly, "It was not taken into consideration. . . ." Mother conceded the Judgment nowhere mentions race or diversity.

 Mother also asserts that the following statements made by the trial judge show Child's education and schooling was a significant issue for him, and he made an improper comparison between the public school testing experience his granddaughter had in Missouri to what Child may possibly experience in Texas; and suggested Child may have a similar reaction to that of his granddaughter to the testing since they were both deemed to be gifted, intelligent children.

> Court: You've got a gifted daughter, but I don't know where that fits if she's going to have to be in kindergarten till she's five. I don't know where the two things fit together, the quality relationship between Dad and his daughter.
>
> His whole world changes if she's in Plano once kindergarten starts and her whole world changes. I'm concerned, ma'am that SandCastle may be a won-

derful program and it may be so well that she gets through kindergarten ahead of her age, okay, but then where does she go? I know you've said that you're looking at other private schools and public schools and they may be available, but I don't know that.

Public schools, assuming down there have a—she's got to test in like they do up here. Well, you know, there is a lot of, I know this sounds rather egocentric, I have a very bright granddaughter who we took down to test in for the city public schools. Basically the person that does the testing was a jerk. She thought she was a jerk and she just sat there and screw you, I'm not going to do anything. You treat me like I'm, you know, a second class citizen I'm not going to do that.

Your daughter may have the same because she's got two educated parents. What I would call the same, what's the word I'm looking for, streak in her where okay, that's the way you would want to be I'll show you. I'm going to do what I want to do. Rebellious would be good, obstinate.

So I don't know where we go. The school thinks it's a significant problem, that's not unfair, it's a significant issue for me. I need to make sure she gets everything she's entitled to. And Dad, obviously, if the minimum age is five and you believe that SandCastle is a program and you believe that the school should be-that she should be in school and you want to say fine, we'll start the kindergarten program, assuming I leave her in Texas, I'm not going to tell you no.

Mother complains that the assumptions of this nature made by the trial judge and resulting comparisons constituted improper personalization of the issues.

We find that the innocuous comments made by the trial judge about his granddaughter made in a general, objective manner after the close of evidence and submission of the case do not indicate prejudice or bias with regard to either party or any divisive issue in the case. They neither support nor suggest any particular outcome in the case.

■ Mother also criticizes the trial judge's sharing of his experience in another custody proceeding. At one point, the trial court asked Mother what she proposed for Father's custody schedule. Mother replied that her preferred parenting plan was Father having Child during summers, with Mother visiting periodically during that time.

Court: If it's his exclusive time he doesn't have to let you see her, does he?
Mother: (Witness indicated).
Court: Any more than you have to let him see her during your exclusive time.
Mother: That's the thing, with us being parents and our communication with each other on that aspect of raising [Child] we've been doing a good job.
Court: You have been doing a marvelous job in many ways, and I see the dark side of this whole problem not with you two but with every other case like the two fools I saw this morning, all right?

Mother maintains this last aside indicates the trial judge based his custody judgment not upon the relevant facts of this case, but upon the court's subjective experience with other individuals, including the "two fools" the court encountered earlier the same day.

■ A brief and transient descriptive remark about the litigants in a case the trial judge presided over earlier in the day does not demonstrate that he based his 38–page decision in this case on his experi-

ence in other cases. Rather, his comment indicates his opinion was merely that Mother and Father were doing a great job, in contrast to the litigants in an earlier case. Opinions formed by the judge on the basis of facts introduced or events occurring during prior proceedings do not constitute a basis for bias or partiality motion, unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. *Liteky v. U.S.*, 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994). Expressions of annoyance that are within the bounds of what imperfect men and women sometimes display do not create bias. *Id.*, 510 U.S. at 555–56, 114 S.Ct. 1147. The trial judge's passing comment about the parties in another case does not display any deep-seated favoritism or antagonism for either Mother or Father making a fair judgment impossible.

Based on the foregoing, Point III is denied.

### Point IV—Federal Tax Dependency Exemption

 Mother maintains the trial court erred in awarding Father the 2012 federal tax year exemption because she was the custodial parent that year. Paragraph 23 of the Judgment provides that "Father shall have the right to claim the minor child as an exemption for federal and state income tax purposes in 2012 and succeeding years." A trial court has broad discretion in awarding tax dependency deductions. *Blechle v. Poirrier,* 110 S.W.3d 853, 856 (Mo.App. E.D.2003). Generally, the primary custodial parent receives the child tax dependency deduction. *Id.*; 26 U.S.C. Section 152(e)(1).

In the case *sub judice,* the Judgment, entered on March 24, 2012, indicates that Father and Mother share joint physical custody but designates Father as the resi-

dential parent for mailing and educational purposes. Additionally, Father was ordered to pay Mother $373 per month in child support beginning April 1, 2012 and ending July 31, 2012. Accordingly, as the Judgment pronounced that in the year 2012, Father was Child's residential custodian as of March 24 and paying child support as of April 1, the trial court was entitled in its discretion to award the 2012 tax refund to Father. Point IV is denied.

### Point V—Parenting Plan

Mother complains the trial court erred with regard to the Parenting Plan it imposed in that it failed to explain why it rejected the parties' proposed Parenting Plans; improperly restricted the geography of certain periods of the physical custody of Mother; failed to allocate holidays; and failed to include a dispute resolution procedure.

As a preliminary matter, since the parties agree that the Parenting Plan implemented by the trial court neglected to include a dispute resolution procedure, it should be remanded for the purpose of including such a procedure.

With regard to the remainder of the alleged flaws in the Judgment's Parenting Plan, this Court finds them to be without merit. The Judgment's 77 specific findings of fact and elucidation of the factors that led to the trial court's specific award of legal and physical custody constitutes sufficient reasoning and explanation as to why the Court adopted the particular Parenting Plan that it did. As for the geographical restrictions, the trial court indicated that Mother's allotted three-day holiday weekends of custody during the school year must be exercised within the State of Missouri. This requirement was imposed by the trial court in consideration of the best interests of Child, which takes precedence

in a custody proceeding over Mother's asserted right to travel.

In the instant case, the trial court did not consider it to be in Child's best interest to be subjected to excessive travel during the school year. See, e.g., *Lavalle*, 11 S.W.3d at 648–49; *Maher v. Maher*, 951 S.W.2d 669, 676 (Mo.App. E.D.1997) (frequency of travel required annually by a child can be excessive constituting abuse of discretion); *Riley v. Riley*, 904 S.W.2d 272, 279 (Mo.App. E.D.1995) (travel imposes tremendous burden on parent and child attempting to spend quality time together when they reside in distant locations; wear and tear of extensive travel diminishes the quality of the time spent together and may well engender deep feelings of resentment on the part of the child, the parent or both).

Finally, with regard to the alleged lack of specificity in apportionment of holidays, the Judgment provides specific instructions for exercising physical custody between the parties for every day of the year, but it also includes a common provision that allows the parties flexibility to create additional periods of physical custody different from those defined in the Parenting Plan should the parties so agree. It is important to allow for certain flexibility for parents and children separated by some distance. For example, it has been held that distant visitation problems can be ameliorated by allowing the non-custodial parent to exercise visitation in the child's city whenever his schedule permits, limited solely by a requirement of specified notice. *Maher*, 951 S.W.2d at 677; *Lavalle*, 11 S.W.3d at 649. The Judgment in the case *sub judice* includes such a provision that provides Mother and Father flexible visitation with Child "at reasonable times and for reasonable intervals, upon reasonable notice" to the other parent.

 We discern no error in the Judgment's Parenting Plan and custody arrangements other than the conceded lack of a plan for resolving disputes that may arise. Accordingly, Point V is granted in part with regard to the lack of a Parenting Plan dispute resolution procedure, and denied in all other respects.

### Conclusion

The Judgment is affirmed in part and remanded in part, in accordance with this opinion.

LAWRENCE E. MOONEY, P.J., and ROBERT G. DOWD, JR., J., concur.